**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CIVIL ACTION NO. 07-392-JBC**

**DEMETRIUS MARQUISE ADAMS,**                                                    **PETITIONER,**

**V.**                                    **MEMORANDUM OPINION AND ORDER**

**THOMAS L. SIMPSON, Warden,**                                                    **RESPONDENT.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court upon the petitioner's request for a writ of

habeas corpus (R. 1) and the respondent's subsequently filed motion to dismiss or,

in the alternative, for summary judgment (R. 11).  The court referred this matter to

the Honorable James B. Todd, Magistrate Judge for the United States District Court

for the Eastern District of Kentucky, who issued a Report and Recommendation (R.

19).  The petitioner has filed objections to portions of the Magistrate Judge's

report.  When the parties to an action submit such objections, the district court

reviews the record *de novo*.  28 U.S.C. § 636(b)(1)(c) .  The court, having

reviewed the record *de novo* in light of the objections and being otherwise

sufficiently advised, will accept the Magistrate Judge's Report and

Recommendation that the court grant the government's motion for summary

judgment.

**I.       Background**

The petitioner seeks a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on a variety of grounds.  He is in state custody for a term of 180 years following his conviction at trial for first-degree rape, first-degree sodomy, two counts of kidnapping, two counts of first-degree robbery, and being a second-degree persistent felony offender.

A.  Factual Background of the Underlying Conviction

The basic facts of the case, as established at trial, are as follows.[1]  On June 19, 1997, Kendrick Searight and a female companion, T.S.,[2] were in a park when they were approached from behind by at least two men.   The two were then blindfolded and bound with duct tape and robbed of their belongings, including T.S.'s ring.  The perpetrators then put Searight and T.S. in a van, drove them to a house, and took them to the basement, where the female was sexually assaulted. Throughout the entire ordeal, T.S. remained blindfolded but nevertheless had some limited ability to see from beneath the bottom of the blindfold, in some space left between the tape and her face.  The two victims were then put back into a van and

---

[1] The court's factual summary uses the opinions issued by the state courts and briefs filed in the state courts by the defendant and the Commonwealth. *See* Commonwealth's Brief for Appellee, A27-33; Brief for Appellant, A5-10; Kentucky Supreme Court Memorandum Opinion in 98-SC-250, A46-50; Kentucky Court of Appeals Order in 06-CA-910, A582.

[2] The court will follow the state practice of identifying victims of sexual assault by their initials only.

released at different locations in the city.  A passing taxi driver came to T.S.'s assistance, and she immediately went to a hospital and reported the crimes.  She gave a statement to police that night while still in the hospital.

Eventually Demetrius Adams and Dexter Middlebrooks were arrested and charged with crimes associated with these events.  The police had been led to suspect Adams when a friend of T.S.'s contacted the police and indicated that Searight had told her that he believed that his cousin, Demetrius Adams, may have been one of the perpetrators.  Although reluctant to be involved in the investigation, Searight eventually provided police with information.  Based on Searight's information, the police obtained a search warrant for Adams's home.  There, the police found evidence matching the descriptions of the scene given by T.S.  The police came to suspect Dexter Middlebrooks when a woman turned in to the police jewelry, identified by T.S. as the jewelry stolen from her, and told police it had been given to her by Middlebrooks.

Approximately four days after the assault, T.S. was asked to identify the perpetrators from a group of photographs, or "photo line-up."  A picture of Adams was included in the line-up, but T.S. did not select it.  She identified another individual and described her certainty as "eight out of ten."  Approximately ten days later, about two weeks after the crimes, T.S. was again asked to identify the perpetrators from a photo line-up.  This second photo-lineup also contained a picture of Adams, and Adams was the only individual who appeared in both line-

3

ups.  This time, she chose Adams's picture and described her level of certainty as "ten out of ten," or 100% certain.

Adams filed a motion to suppress evidence of the photo-line-up identification and any in-court identification at trial.  After a hearing on February 7, 1998, at which only an investigating officer testified, the trial court denied the motion.  Four days later the trial began and lasted for only two days.  At trial, the evidence against Adams included the in-court identification of the two victims; hair evidence that was not conclusive but also did not eliminate him as a possible perpetrator; fiber samples from T.S.'s clothing that matched fibers from the van; and the testimony of Middlebrooks, who had agreed to plead guilty to one count of sodomy in exchange for his testimony against Adams.  There was a lack of DNA evidence accompanied by physical evidence, latex in T.S.'s vaginal cavity, that tended to show that the assailants likely used a condom.  Adams presented one witness in his defense, Vance Harris, who served as an alibi witness but admitted on cross-examination that he could not vouch for Adams's whereabouts on the particular night in question, only for a general pattern of behavior.  The jury found Adams guilty of all counts and on March 17, 1998, the trial court sentenced him to a total of 180 years in prison.


B.    Procedural History

The case has a somewhat complicated procedural history in the Kentucky state courts.  The Supreme Court of Kentucky affirmed Adams's conviction on May

4

13, 1999. (A 46-53).  Adams subsequently filed two post-conviction motions with the trial court, the denials of which also became the subjects of appeal.

On April 13, 2000, Adams, *pro se*, filed a motion to vacate under Kentucky Rule of Criminal Procedure (RCr) 11.42, raising some seventeen claims of ineffective assistance of counsel and other trial errors.  *See* R.30.  On August 10, 2000, appointed counsel filed a supplemental motion to vacate, accompanied by a memorandum of law in support, focusing on one particular claim of ineffective assistance of counsel.  *Id.*  The Fayette Circuit Court denied the motion on January 24, 2001.  *Id.*  The petitioner appealed, and the case was docketed by the Court of Appeals of Kentucky as 2001-CA-227.

While that appeal was pending, on June 7, 2001, the petitioner filed another post-conviction motion in Fayette Circuit Court, this time pursuant to Kentucky Rule of Civil Procedure (CR) 60.02.  *See* R. 30.  The Fayette Circuit Court denied the motion on July 27, 2001.  *Id.* The petitioner appealed, and the case was docketed by the Court of Appeals of Kentucky as 2001-CA-2273.  The petitioner's two post-conviction actions were joined on appeal, and the trial court's two rulings were affirmed by the Court of Appeals of Kentucky. A 231-41.

On November 17, 2004, Adams filed a state petition for writ of habeas corpus (04-CI-186), claiming a double-jeopardy violation.  The petition was denied and Adams appealed (05-CA-832).  *See* A 341-454.  The Court of Appeals of Kentucky affirmed that denial (A 467-69), and the Supreme Court of Kentucky denied the petitioner's motion for discretionary review (A 494).

5

Adams then filed another post-conviction motion under CR 60.02, claiming an error relating to DNA evidence. The state court denied the motion, the Court of Appeals affirmed that denial (A 560-64), and the Supreme Court of Kentucky denied discretionary review (A 608).

Adams subsequently filed the instant petition for habeas corpus, *pro se*. The respondent filed with this court a hard copy of the state court record (R. 14) and subsequently supplemented the record with copies of Adams's post-conviction motions (R.30), in compliance with this court's order.

## II.    Standard of Review

Review of petitions for habeas corpus is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. 28 U.S.C. § 2254(d) imposes the following standard of review that a federal court must utilize when reviewing such applications:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of the statute, a federal court may grant relief if the state courts, in affirming the conviction, either arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of federal constitutional law or decided the prisoner's case differently than the United States Supreme Court decided the same constitutional question on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause of the statute, relief is warranted if the state courts in affirming the conviction identify the correct governing principle of constitutional law from decisions of the United States Supreme Court but unreasonably apply that principle to the facts in the case. *Williams*, 529 U.S. at 407-08; *Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001). The key question in an "unreasonable application" analysis is whether the state-court decision was objectively unreasonable, not whether it was merely erroneous or incorrect. *Williams,* 529 U.S. at 409. Further, "findings of fact made by a state court are presumed correct and can be contravened only where the habeas petitioner shows by clear and convincing evidence that the state court's factual findings were erroneous." *Bugh v. Mitchell,* 329 F.3d 496, 500 (2003); 28 U.S.C. § 2254(e)(1).

"Clearly established federal law, as determined by the Supreme Court" of the United States is limited to the law established by U.S. Supreme Court cases. *See Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998). It is further limited to the "holdings, as opposed to the dicta" of such decisions. *Williams*, 529 U.S. at 412.

7

The decisions of lower federal courts may be used by the court to determine how

the U.S. Supreme Court law has been applied to "various fact situations" in order

to aid the court in "determin[ing] what is an 'objectively unreasonable application'

of clearly established federal law." *Robertson v. Abramajtys*, 144 F.Supp. 2d 829,

836 n.4 (E.D. Mich. 2001) (citations omitted).


III.    **Petitioner's Claims**

Adams's petition presents five broad grounds for the issuance of a writ of

habeas corpus: (1) error in admission of identification evidence; (2) ineffective

assistance of trial counsel; (3) improper police conduct in identification by Searight

(4) double jeopardy; and (5) actual innocence.  Adams objects to the Magistrate

Judge's findings, and the court will consider each of his claims in turn.[3]  To the

_____

[3]Adams also complains of inadequate access to the prison's legal materials,
explaining that "[h]ad [he] been able to review and research the federal law, he
would have been able to adhere to the standards that are within the federal law."
*See* R. 25, p. 2-3.  This complaint is outside the scope of his habeas petition, as it
does not relate to the "legal sufficiency of the criminal court proceedings which
resulted in the incarceration of the petitioner." *Maddox v. Rose*, 483 F.Supp. 661,
672 (E.D. Tenn. 1980).  Adams also protests the Magistrate Judge's denial of
leave to amend his habeas petition (R. 23). *See* R.25, p. 3.  The court will
construe his complaints as a request that the court reconsider the order and this
request is denied.  As explained in the Magistrate Judge's order, the claims the
petition seeks to add to the petition are procedurally defaulted and Adams provided
no showing of either cause of prejudice. *See* R.23, p.3-4; *Seymour v. Walker*, 224
F.3d 542, 550 (6th Cir .2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87
(1977)).  Presumably to show cause, Adams now points to a letter from his
appellate counsel and a pro se supplemental filing with the Kentucky Supreme
Court.  A 313-14, 590-97.  These documents do not refer to the fourteenth
amendment, sufficiency-of-the-evidence argument that the petitioner now attempts
to make.  However, even had they established cause, Adams still fails to make any

8

extent that Adams does not specifically object to the report and recommendation, the court concurs in the results recommended by the Magistrate Judge. *Thomas v. Arn,* 474 U.S. 140 (1985).

A.    The female victim's identification of the petitioner.

Adams claims that the admission at trial of evidence that T.S. identified him in a photographic line-up prior to trial as well as her in-court identification of him during trial violated his right to due process of law, guaranteed by the Fourteenth Amendment of the U.S. Constitution. He objects to the Magistrate Judge's determination that he is not entitled to relief on this ground.

Petitioner raised this claim in his direct appeal of his conviction. The respondent does not claim that the petitioner failed to exhaust his state-court remedies. This claim is eligible for this court's review.

Specifically, Adams challenges the accuracy of the facts on which the state appellate court bases its resolution of the admissibility of the identification evidence. Adams argues that the court misstated the facts in the case when it found that T.S. testified at trial that she had noted Adams's appearance four times during the encounter. The petitioner claims that "[o]n the contrary, the female victim emphatically stated that she did not see her attackers," citing TR 1, 10:45:03, 10:45:14, 10:45:34, 10:47:02, 10:50:00 and 11:19:24. R. 25, p.6.

_____

showing of actual prejudice.

9

1.    **Applicable federal law**

A defendant's right to due process of law, as protected by the Fourteenth

Amendment of the U.S. Constitution, is violated if the "confrontation leading to the

identification was 'so unnecessarily suggestive and conducive to irreparable

mistaken identification that [the defendant] was denied due process of law.'"

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388

U.S. 293, 301-02 (1967); *Neil v. Biggers*, 409 U.S. 188, 197 (1972)); *see also*

*Foster v. California*, 394 U.S. 440 (1969).  Due process requires that the defendant

be protected against the introduction of evidence of identifications that were

obtained through suggestive procedures.  *Simmons v. US*, 390 U.S. 377, 384

(1968).  However, identifications obtained through suggestive means may still be

admissible if they are nevertheless reliable.  *Manson v. Brathwaite*, 432 U.S. 98,

116-17(1977); *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

"[T]he central question [is] whether under the 'totality of the circumstances'

the identification was reliable even though the confrontation procedure was

suggestive."  *Neil*, 409 U.S. at 199.  First, the court must determine whether the

identification procedure was suggestive.  *See Ledbetter*, 35 F.3d at 1070 (citing

*Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986)).  If it was, then the court

evaluates whether, despite that suggestiveness, under a totality of the

circumstances "there are nevertheless sufficient independent indicia of reliability."

*Id.* (citing *U.S. v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992); *see also Tipton v.*

10

*Carlton*, No. 06-5496, 2008 WL 5397785, at *6-7 (6th Cir. Dec. 29, 2008).[4]

"[R]eliability is the linchpin in determining the admissibility of identification

testimony" following suggestive identification procedures.  *Manson v. Brathwaite*,

432 U.S.  at 114.

A court uses the factors enumerated by the Supreme Court in *Neil v. Biggers*,

409 U.S. 188, 199 (1972), to evaluate the reliability of the identification.  *Manson*

*v. Brathwaite*, 432 U.S. 98 (1977); *see Keene v. Mitchell*, 525 F.3d 461 (6th Cir.

2008) (citing *Howard v. Bouchard*, 405 F.3d 459, 472 (6th Cir. 2005)).  "[T]he

factors to be considered in evaluating the likelihood of misidentification include the

opportunity of the witness to view the criminal at the time of the crime, the

witness' degree of attention, the accuracy of the witness' prior description of the

criminal, the level of certainty demonstrated by the witness at the confrontation,

and the length of time between the crime and the confrontation."  *Neil*, 409 U.S. at

199-200.  The factors supporting reliability are then weighed against "the

---

[4]Kentucky state case law recognizes that a court should first determine
whether the identification procedure was suggestive, then determine, using the *Neil
v. Biggers* factors, whether the resulting identification is reliable enough to be used.
*See, e.g.*, *Wilson v. Commonwealth*, 695 S.W.2d 854, 857 (1985) ("When
examining a pre-trial confrontation, this court must first determine whether the
confrontation procedures employed by the police were 'suggestive.'  If we conclude
that they were suggestive, we must then assess the possibility that the witness
would make an irreparable misidentification, based upon the totality to [sic] the
circumstances and in light of the five factors enumerated in *Biggers*.").

corrupting effect of the suggestive identification itself" to determine the likelihood

of misidentification.  *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).[5]


**2.    Kentucky Supreme Court's Analysis of the Claim**

The Kentucky Supreme Court addressed the claim that the identification

evidence was admitted in violation of due process as follows:

> Adams first claims that the trial court erred in admitting evidence of the victim's photographic identification of Adams prior to trial, and her in-court identification at trial, because the likelihood of misidentification was too great.

> Approximately four days after the crime occurred, the police presented the victim with a photographic array which contained a photograph of Adams that was nearly ten years old. The victim hesitated before identifying a person portrayed in the array as being her attacker. The person she identified was not Adams. She rated the certainty of her identification as an eight on a scale of one to ten. Approximately ten days later and two weeks after the crime, the police presented the victim with another photo array, which contained a recent photograph of Adams. This time, the victim identified Adams as her attacker without hesitation. She stated that she was 100 percent certain of her identification.

> Adams made a pre-trial motion to suppress the identification on the grounds that the photo identification process used by the police was unduly suggestive. He objected to the victim's in-court identification on the same grounds.

---

[5]The same standard applies to both identification challenged by Adams.  *See Neil v. Biggers*, 409 U.S. 188, 198 (1972); *see also U.S. v. Hill*, 967 F.2d 226, 232 (6th Cir. 1992).  The source of suggestiveness is the same for both identifications – the repetition of Adams's photo in the second photo-lineup. Similarly, as the identification at issue was made by the same individual, the facts supporting the reliability of the identification are also the same for the two identifications.

> [E]ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 972, 19 L.Ed.2d 1247 (1968). Whether a photographic identification procedure was impermissibly suggestive is determined in light of the totality of the surrounding circumstances. *Id.* at 383, 88 S.Ct. at 970; *accord Savage v. Commonwealth*, Ky., 920 S.W.2d 512, 513 (1995).

*Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), sets forth five factors to be considered in the totality of circumstances analysis for determining the admissibility of in-court identification by a witness who previously had identified the defendant pursuant to a photographic lineup. These factors include: the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of her prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *Id.* at 199, 93 S.Ct. at 382. In light of these factors, and based upon the totality of the circumstances, the court must assess the possibility that the witness would make an irreparable misidentification. We find that each of the five factors was met in this case, and each of them will be discussed in turn.

The first factor in *Biggers* is the opportunity of the witness to view the criminal at the time of the crime. Id. Even though the victim was partially blindfolded, she could see through the bottom of the blindfold. She had several opportunities to see Adams during the course of her ordeal, which lasted well over an hour. She described to detectives in detail the basement where she was raped and the van in which she and the other victim were transported. She noted Adams' appearance more than four times during the crime, and she described Adams accurately and thoroughly to a police detective.

The second factor is the witness's degree of attention. Id. As with the victim in *Biggers*, the victim in this case was "no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Id.* at 200, 93 S.Ct. at 382-83. She was the victim of the crime and made a concentrated effort to look beneath her blindfold to see her surroundings and her attackers.

13

The third factor is the accuracy of the victim's prior description. *Id.* at 199, 93 S.Ct. at 382. The victim accurately described the van and the crime scene, and accurately described Adams. In addition, she selected Adams' updated photo from a lineup with 100 percent certainty.

The fourth factor is the level of certainty demonstrated by the victim. *Id.* When faced with the first photo lineup, the victim selected a photo that looked similar to her attacker, but was not Adams. In fact, the photo of Adams was nearly a decade old. When the victim looked at a second photo lineup including an updated photo of Adams, she selected Adams without hesitation. Even now, when the two photos of Adams are placed side by side, it is very difficult to see that they depict the same person. The trial judge noted the difference between Adams' photos and similarity between Adams and the photo the victim initially identified as her attacker.

The final factor is the time between the crime and the confrontation. *Id.* In the instant case, the first lineup was only four days after the crime, and the second lineup was only two weeks after the crime. In Biggers, the time lapse between the crime and the confrontation was seven months, and the Court found no substantial likelihood of misidentification. *Id.* at 201, 93 S.Ct. at 383. When the victim in the instant case made the photo identification of Adams, it is certain that the crime was still fresh in her mind. A period of only two weeks would not have erased such a devastating experience from her memory.

Therefore, we hold that, based on the totality of the surrounding circumstances, the photo identification procedure used by the police in this case was not impermissibly suggestive.

98-SC-250-MR, AR 47-50

3.    **Analysis of Petitioner's Claim that Appellate Court's Decision Was Based on Unreasonable Determination of the Facts**

a.    *State Appellate Court Did Make Incorrect Statement of Facts*

"[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding . . . ." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing § 2254(d)(2)); *Williams*, 529

14

U.S., at 399 (O'CONNOR, J., concurring)).  The state court's factual

determinations are presumed correct, unless successfully rebutted by the petitioner

by clear and convincing evidence.  *Brown v. Smith*, 551 F.3d 424, 430 (6th Cir.

2008) (citing § 2254(e)(1)).  The factual determinations of the state appellate

court, just like those of the state trial court, are cloaked in this presumption of

correctness.  *Matthews v. Ishee*, 486 F.3d 883 (6th Cir. 2007) (citing *Sumner v.

Mata*, 449 U.S. 539, 546-47 (1981)).  This presumption extends to factual

findings made by the state appellate court on the basis of review of the trial court

records.  *See id.*; *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir.2001).

        Here, the petitioner attempts to make the necessary showing of clear and

convincing evidence by pointing to specific portions of T.S.'s trial testimony.  This

court therefore reviewed the transcript of the trial court record.  *See U.S. ex rel.

Roman v. Washington*, No. 96-737, 1996 WL 554541, at *3 (N.D. Ill. Sept. 25,

1996) (noting that when a habeas petitioner identifies specific inaccuracies or

incompleteness in the state appellate court's factual findings, the federal court

must review the state trial court record (citing *Blenski v. LaFollette*, 581 F.2d 126,

128 (7th Cir. 1978)).

        While the court disagrees with the petitioner's characterization of T.S.'s

testimony as being that she never saw her attackers, the court agrees with the

petitioner to the extent that he argues that T.S. did not testify that she had seen

her attacker four times.  T.S. clearly testified that she saw the man she identified

as Adams only once.

15

There were two attackers, identified at trial as Adams and his co-defendant, Middlebrooks.  The state court's misapprehension of how many times T.S. claimed to have seen Adams may be due to the imprecise language she used to differentiate between Adams and Middlebrooks.  At times it is not readily apparent to which man she was referring.[6]  However, taking her testimony as a whole, it is possible to understand when she meant which man and to conclude that she saw the man she identified as Adams only once.[7]

---

[6]For example, T.S. referred to Adams as "the guy with the deep voice" or "the mean guy" or "the tall guy."  *See, e.g.*, TAPE 1, 2/11/98 10:45:00.  She referred to the other man, now identified as Middlebrooks, as "the short guy" or as "dark."  *See id.*10:53:00.  However, taking the record as whole, the prosecutor's questions and T.S.'s replies eventually make the distinction clear.

[7]As this case has suffered from misstatements of T.S.'s testimony, the court here will attempt to clarify the record.  The court has before it a video transcript, not a written transcript, of the trial.  The production of a video transcript, rather than a written transcript produced by a court reporter, is Kentucky's usual practice.  Due to the difficulty of transcribing direct quotes from the video transcript, the court here provides a summary of T.S.'s testimony, with certain portions transcribed verbatim.

At trial, T.S. described the incident chronologically.  *See* TAPE 1, 2/11/98; 10:45:14. In response to the prosecutor's questioning, T.S. testified that at three separate instances during the attack she had *not* yet seen Adams's face.

First, the prosecutor asked T.S. whether she saw her attackers when they initially approached her, before she was blindfolded.  T.S. answered, "No." *Id.* 10:45:14-30.  Second, when T.S. described the men taking her from the park and putting her into a van, which she testified she could see was maroon with a red interior, the prosecutor asked: "Did you see either one of them in the van?" T.S. replied, "Not at this point." *Id.* 10:50:00-06.   T.S. then described seeing other things at the house when she arrived – the refrigerator, kitchen cabinets, etc. *Id.* 10:51:00.

Third, the prosecutor asked T.S. whether she saw the men after arriving at the house, and T.S. replied, "Yes." *Id.* 10:52:19.  T.S. then described a single incident: while walking down the stairs to the basement, she saw one of the men three steps below her.  She testified that it was the "short guy" and that he was "dark complected." *Id.*  She then related that this individual somehow became suspicious that she could see, that he said something to her to that effect, and so,

16

Thus, the video transcript reveals by clear and convincing evidence that the Kentucky Supreme Court's statement that T.S. saw her attacker four times over the course of the kidnapping and assault is inaccurate.

> b.    *Error Renders Unreasonable State Appellate Court's Factual Determination as to First Factor of Neil But Does Not Affect Validity of Overall Conclusion as to Identification's Admissibility*

The court therefore must determine whether this factual mistake was so material as to render the admission of the identification evidence constitutional

---

frightened, she closed her eyes again for the majority of the time she was assaulted at the house.  The prosecutor asked T.S. what she saw before closing her eyes again, and T.S. re-iterated that the man was "dark," "5'6" maybe" and wearinga a red shirt.  *Id.* 10:53:05.  The prosecutor then asked T.S. whether she ever saw that man again, perhaps in the van later, and T.S. replied that she did not.  It is clear from her later testimony that the person she testified that she saw on the stairs was Middlebrooks, not Adams.

After T.S. has testified to the specifics of the assault, including all events leading up to the time when she and Searight were put into the van and taken away from the house, the prosecutor asked: "At this point, had you seen the man that you describe as the tall one with the deep voice?" T.S. replied "At this point, no." *See id.* 11:19:30-38.  She then went on to describe riding in the van and taking various turns.  *Id.* 11:22:00.  It was then that T.S. testified: "This is when I saw him and the little short guy in the front."  *Id.* 11:22:25.  "Him" is Adams.  T.S. described seeing him turn to the side, talking to his companion.  She testified that she saw his face illuminated by the lights coming from the dashboard.  She described it as a "thin face," with glasses.  The prosecutor then had T.S. make her in-court identification of Adams.  *Id.* 11:23:40-42.

T.S. did testify to being able to see, generally speaking, at various points during her ordeal.  During those periods where she opened her eyes, she usually saw things close to the ground.  *Id.* 10:48:01 (testifying that she could "see everything down low.").   She described the kitchen of the house, including the color of the refrigerator, the magnets on the refrigerator, a kitchen table, a shoe rack, the weight bench in the basement, and more.  *See id.* 10:58:00-10:59:00.

The record is clear that T.S. did *not* testify to having noted Adams's appearance on four separate occasions during the course of her encounter with him.

error.  *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Andrade*, 538 U.S. at 75.  The habeas court may grant relief only if the evidence is "too powerful to conclude anything but" the contrary of the conclusion reached by the state court.  *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005); *see, e.g.*,  *Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008) (finding that state court's determination of the facts was objectively unreasonable where state court found that petitioner's statement "I plead the Fifth" was ambiguous invocation of his right to remain silent in the face of custodial interrogation).

"[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor*, 366 F.3d at 1001 (citing *Wiggins*, 539 U.S. 510, 527-28 (2003)).  "[A] factual finding (or assumption) which lacks any record support, which is contradicted by evidence in the record, and which is shown to be factually wrong by information which is readily accessible and unquestionably accurate is an objectively unreasonable determination of the facts under 2254(d)(2)." *Fargo v. Phillips*, 129 F.Supp.2d 1075 (E.D. Mich. 2001), *overturned on other grounds*, 58 Fed. App'x 603 (6th Cir. 2003).

The state appellate court's factual finding lacks any support in the record, is contradicted by evidence in the record, and is shown to be wrong by easily accessible information.  It is therefore an objectively unreasonable determination of the facts – but the error taints only the state appellate court's determination regarding the first factor of the *Neil* totality-of-the-circumstances test.

 A finding of factual error with respect to one factor of a five-factor, totality-of-the-circumstances test does not render the court's overall determination "objectively unreasonable."  The petitioner does not challenge the appellate court's factual findings as to the other four *Neil* factors.  Thus the court grants the remainder of the appellate court's findings a presumption of correctness, and those findings support a conclusion that the identification by T.S. was supported by strong indicia of reliability.

In its opinion, the Kentucky Supreme Court did not analyze explicitly whether any suggestiveness of the identification procedure was outweighed by these strong indicia of reliability.  *See* A 50.  However, the court did note that "[e]ven now, when the two photos of Adams are placed side by side, it is very difficult to see that they depict the same person. The trial judge noted the difference between Adams' photos and similarity between Adams and the photo the victim initially identified as her attacker."  A 49-50.  The only alleged source of suggestiveness is that Adams was the only individual whose photograph appeared in both the first

and the second photo line-up shown to T.S.[8]  The state appellate court's factual findings go to the potential suggestiveness of the inclusion of Adams's photograph in both line-ups and indicate that the appellate court found no undue suggestiveness.  *See Halyim*, 492 F.3d at 704 (describing suggestiveness as "depend[ing] on whether the witness's attention was directed to a suspect because of police conduct").   This court concludes that despite the lack of an explicit weighing of the reliability of the underlying identification against the "corrupting effect of the suggestive identification," the state court's ultimate conclusion that the identification evidence was admissible is in line with U.S. Supreme Court precedent.  *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) ("Compliance with § 2254(d) does not require citation of Supreme Court cases – indeed, it does not even require awareness of [Supreme Court ] cases, so long as neither the reasoning nor the result of the state court decision contradicts them." (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)); *Williams*, 529 U.S. at 388 ("Overall, the state-court judgment must be upheld unless, after the closest examination of that judgment, a federal court is firmly convinced that a federal constitutional right has been violated.").

_____

[8]This aspect alone does not render the line-up impermissibly suggestive.  *See Williams v. Lavigne*, 209 Fed. App'x 506, 508 (6th Cir. 2006) (holding no error by state court in concluding photo lineup not suggestive, where victim "shown several lineups and photo arrays, all of which contained [the defendant's] picture"); *Lewis v. Vasbinder*, No. 04-71140, 2007 WL 2812306, at *7 (E.D. Mich. Sept. 27, 2007) (finding no suggestiveness where defendant was the only person who appeared in the photo array and in the live line-up).

B.     Ineffective Assistance of Counsel

Adams claims that he received ineffective assistance of counsel during the trial court proceedings.  In his petition, he broadly describes four ways in which he received ineffective assistance: (1) counsel failed to file proper suppression motion; (2) counsel failed to produce critical alibi witnesses at trial; (3) counsel failed to investigate victim's photo identification; and (4) counsel failed to investigate and develop the case.  In subsequent pleadings, he clarifies the contours of his claims.

Adams raised some claims of these claims of ineffective assistance of counsel during state court proceedings.  Others he raises for the first time in the instant petition.  The Magistrate Judge's Report and Recommendation determined that the plaintiff's claim that counsel was ineffective due to (1) counsel's failure to investigate victim's photo line-up identification of Adams and (2) counsel's failure to investigate and develop the case were not raised in state court and therefore are now procedurally defaulted and do not establish grounds for federal habeas relief. Adams does not object to these findings, and the court concurs with the Magistrate Judge's conclusions.

Adams does object to the Magistrate Judge's findings as to two of his claims for ineffective assistance of counsel: (1) counsel's failure to file a "proper" suppression motion and (2) counsel's failure to produce at trial two alibi witnesses. The court will address each in turn.

21

1.     **Applicable Federal Law**

The Sixth Amendment of the U.S. Constitution guarantees a defendant

charged with a crime the right to effective representation at trial. *See Strickland v.*

*Washington*, 466 U.S. 668 (1984).  In order to establish that this constitutional

right was violated, the petitioner must establish (1) that counsel's performance fell

outside the wide range of professionally competent assistance guaranteed by the

Sixth Amendment; and (2) that the deficient performance prejudiced the defense so

seriously that but for the alleged error of counsel, there is a reasonable probability

that the result would have been different. *See Strickland*, 466 U.S. 668 (1984).


2.     **No Basis for Habeas Relief in Counsel's Alleged Failure to File "Proper"**
       **Suppression Motion**

The petitioner claims that he received ineffective assistance of counsel

because his trial counsel failed to file a "proper suppression motion."  In his direct

appeal of his conviction, petitioner, through counsel, argued that trial counsel's

performance was deficient due to his failure to move to suppress the search of

petitioner's home.  To the extent that the petitioner has argued he is entitled to a

writ of habeas corpus on this ground, the court adopts the Magistrate Judge's

finding.

However, in Adams's reply (R. 16) and objections to the Magistrate Judge's

Report and Recommendation (R. 25), he narrows the broad claim made in his

petition, specifying that he is asserting counsel was ineffective due to his failure to

file a motion to suppress Kenneth Searight's identification.[9]  Adams describes the
resulting harm as being that "the identification was allowed to stand and the jurors
were left to believe that petitioner had been identified by both victims in a legal
proceeding." R.25, p.9.[10]  Adams then notes the requirements of *Strickland* of
deficient performance and resulting actual prejudices, adding that he "believes that
he has shown this within the suppression hearing." *Id.*

Adams's post-conviction RCr 11.42 motion contains the same claim of
ineffective assistance of counsel.  *See* R. 30, A 14.  Counsel was appointed to
represent Adams in his RCr 11.42 claim, and counsel narrowed Adams's seventeen
claims of error to one: ineffective assistance of counsel due to failure to request
suppression of the search warrant.  *See* R.30, A 176-96.  The trial court ruled on
the RCr 11.42 motion on that ground alone, and the appellate court also addressed

---

[9]Adams elaborates that Searight's identification should have been suppressed
because (1) Searight told investigators that he did not see anyone due to having
"blacked out" and (2) investigators told Searight to pick petitioner out of the line-
up.

[10]Adams also states that "it was clear that it was Searight's identification
that the police were using as probable cause to arrest and secure a search
warrant."  R. 25, p. 8.  A motion to suppress is a vehicle for requesting that the
trial court exclude certain evidence from trial; it has no bearing on what evidence
was or could have been used to establish probable cause for an arrest.  Thus, by
arguing his trial counsel should have filed a motion to suppress Searight's
identification, he is contending that trial counsel should have requested that the trial
court exclude from trial any evidence of Searight's identification of Adams.
Whether or not trial counsel was ineffective due to his failure to challenge the
probable cause for Adams's arrest is a separate argument not presently before the
court.

only the single claim.  This claim for relief was therefore never considered by the state court.

In order for a petitioner to have exhausted his state remedies, he must have presented the federal constitutional claim to the state's highest court.  *See Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  When a petitioner has not exhausted his state remedies, the federal court must determine whether the petition should be dismissed in order to allow for the petitioner to present the claim to state court.  *See Rhines v. Weber*, 544 U.S. 269, 275-76 (2005).  If the petitioner failed to present claims in state court but would now be procedurally barred from doing so, there is a procedural default for purposes of federal habeas.  *Coleman v. Thompson*, 501, U.S 722, 735 n.1 (1991); *Castille v. Peoples,* 489 U.S. 346, 351 (1989) ("requisite exhaustion may nonetheless exist ... if it is clear that [petitioner's] claims are now procedurally barred under [state] law").

Here, it is clear that the petitioner would be procedurally barred from raising the claim in the state courts.[11]

---

[11]In Kentucky, the two vehicles for post-conviction remedies after an exhausted direct appeal are RCr 11.42 and CR 60.02.  Adams has already filed one RCr 11.42 and two CR 60.02 motions.  An Rcr 11.42 motion must be filed within three years of a final judgment.  The petitioner already has brought two CR 60.02 motions.  In the appellate decision affirming the trial court's denial of the second, the state court noted that the CR 60.02 motion was improperly filed and claims which it raised could not be considered in a CR 60.02 motion.  A 562.  Therefore, any avenue for relief to the defendant is foreclosed and any claim not ever raised in the state courts would now be procedurally barred by the state court.

24

"A petitioner may avoid . . . procedural default only by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir .2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

The petitioner's attempt to raise the issue *pro se* does not establish good cause for the default.  *See Freeman v. Moore*, No. , 2008 WL 5233074 (6th Cir. Dec. 12, 2008) (concluding no good cause shown where petitioner filed *pro se* briefs with the appellate court, appellate court refused to consider them, and petitioner never raised the propriety of the appellate court's rejection of his briefs with that state appellate court);[12] *Hill v. Carlton*, 2008 WL 597616, at *2 (finding that where appellate counsel did not incorporate or endorse the petitioner's *pro se* filings, claims presented in *pro se* filings but not considered by the state court were not exhausted).

Even assuming for the sake of argument that the petitioner's *pro se* attempt to raise the issue and counsel and the state courts' failure to address it did establish good cause, Adams has not established that he was prejudiced by counsel's failure to challenge Searight's identification. Searight's identification was compelling evidence against Adams.  However, Adams makes no showing that a

---

[12]And, significantly, no where in his filings does petitioner claim ineffective assistance of *appellate* counsel.  *See Freeman* 2008 WL 5233074, at *4 (noting that "ineffective assistance of appellate counsel can generally provide cause for procedural default").

25

motion to suppress that evidence would have been successful.  *See U.S. v. Thomas*, 38 Fed. App'x 198, 201-02 (6th Cir. 2002) (noting that where filing a motion to suppress would have been "futile," "[n]ot filing such a motion was not ineffective assistance of counsel"); *Worthington v. U.S.*, 726 F.2d 1089, 1092-94 (6th Cir. 1984) ("[W]hether trial counsel . . . acted incompetently in not filing a timely motion to suppress depends upon the merits [of the underlying claim]."). Nor is it likely that he could have done so successfully.  *See infra*, section IIIC. Therefore, there is no prejudice in trial counsel's failure to move to suppress Searight's identification.

### 3.   No Basis for Habeas Relief in Counsel's Failure to Produce at Trial Two Alibi Witnesses.

The petitioner claims that counsel was ineffective because he failed to call at trial two alibi witnesses.  These two witnesses, according to their affidavits, submitted in the petitioner's pleadings, would have testified that Mr. Adams was at GEA Parts LCC, on Palumbo Drive in Lexington, Kentucky between 10:30 and 11:00 p.m. on June 19, 1997, the day the attack on the victim took place. *See* R. 25, attachment 11.

Adams objects to the Magistrate Judge's Report and Recommendation as to this claim.  He argues that "[c]ounsel had an obligation to produce the alibi witnesses at trial, [and] when counsel failed to do this, he was deficient in his performance."  R.25, p.10.  He further states that because of this failure, "the jury was left with only the victim's version of the events."  *Id.*

26

Adams exhausted his state remedies as to this claim.  The Kentucky Court of

Appeals concluded that counsel was not ineffective due to this failure, stating in

part:

> [D]efense counsel's decision not to call the disputed witnesses was a matter of
> trial stratgey. [. . .] The record indicates that defense counsel was familiar with
> and did investigate statements made by two witnesses who claimed simply to
> have seen Adams sometime between 10:30 and 11:00 on the night in question.
> Instead of calling them as witnesses, however, defense counsel called Vance
> Harris, who was able to provide a more comprehensive alibi.
>
> Harris testified that Adams had been with him in Harris's apartment from 11:30
> on the evening of June 19, 1997, until the early morning hours of June 20,
> 1997, the very time during which the crime was calculated by several
> witnesses to have occurred.  The testimony of the disputed witnesses would
> not necessarily have ruled out Adams as a perpetrator; on the other hand,
> Harris's testimony would have wholly excluded him as a perpetrator.  In light
> of this contradictory evidence, we cannot second-guess counsel's decision not
> to call these witnesses to the stand.  It was a matter of trial strategy and within
> the wide range of professionally competent assistance

A 238-39.

The Kentucky court's resolution of this claim is in line with federal law, as

articulated by *Strickland*.  The court determined that counsel's failure to call the

two alibi witnesses was not deficient performance and therefore did not reach the

second prong of the *Strickland* test.  Contrary to Adams's contention otherwise,

trial counsel had no obligation to call alibi witnesses, and choosing not to do so can

be considered sound trial strategy.[13]

_____

[13]In support of his argument, Adams cites *Jemison v. Foltz*, 672 F.Supp.
1002 (E.D. Mich. 1987).  In *Jemison*, the court determined that the defendant had
received ineffective assistance of counsel.  *Id.* at 1008.  However, the court did not
hold that a decision not to call an alibi witness could not be considered sound trial
strategy.  Rather, the *Jemison* court recites a litany of errors committed by trial
counsel, including failure to file any motions, waiver of jury trial in favor of a bench

Nor was the state court's determination of the facts on which it based this conclusion unreasonable.  Although entitled to deference, counsel's strategy must be "objectively reasonable."  *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001). Trial counsel did secure the presence of and present testimony of one alibi witness, Vance Harris.  The alibi provided by Harris was not as airtight as presented by state court.  Although Harris initially testified that Adams was with him on the night in question, on cross-examination he conceded that he could not swear to the date and that he was only sure that often Adams came by late at night in order to talk with him.  However, as the state court noted, the testimony of the two alibi witnesses would have established an extremely limited alibi at best.  It was not unreasonable for the state court to conclude that trial counsel's decision to call Harris as a witness, rather than the two women, was within the broad spectrum of objectively reasonable trial strategy.

C.    Improper identification by Kendrick Searight

Adams claims that Kendrick Searight's identification of him was improperly obtained by the police, in violation of his constitutional right to due process.  The Magistrate Judge found that the state court properly considered the claim.  Adams

---

trial to a judge familiar with defendant's criminal record, failure to give either opening statement or closing argument, a "highly limited and ineffectual" cross-examination of the prosecution's only witness, as well as counsel's failure to interview a "potentially effective" alibi witness.  *Id.*  Not only is the case distinguishable because the court considered the alibi witness "potentially effective," the court's ultimate finding of counsel's unconstitutional ineffectiveness was based on all of the conduct "taken together."  *Id.*

specifically objects that the state-court decision did not properly take into account that "Searight told investigators that he did not see a face that night, and that he had blacked out.  This is when Searight was told by investigators to pick out 'Demetrius Adams' specifically."  R. 25, p. 12 (citing Taped Interview with Kendrick Searight, 6/24/97/C-90A).  Adams also argues that "[t]here is clearly established federal law that strenuously opposes the police officer telling the witness who to choose out of a photo line-up." *Id.*  The court concurs with the Magistrate Judge that this claim does not state a basis for habeas relief.

Adams raised this claim in his request for post-conviction relief made pursuant to CR 60.02, the claim was considered by the Kentucky Court of Appeals, A 240-41, and the Kentucky Supreme Court denied discretionary review.  A 340. In its decision, the appellate court concluded that Adams had not suffered a constitutional violation.  This court finds no reason, applying 28 U.S.C. § 2254(d), to disturb that ruling.

The state court, reaching the merits of the claim, determined that there was no factual basis to support Adams's claim of a due process violation:

> Searight does not now – nor has he ever – recanted his trial testimony identifying Adams as one of his attackers.  Moreover, Adams's impressions of Searight's state of mind or motivation for testifying have not been verified by Searight in any acceptable manner.  Handwritten notes from an interview with Searight reveal nothing more than the same hesitation that Searight felt toward being involved in the investigation of the case. Searight's reluctance was clearly explored at trial.  There is no allegation that he gave false or perjured testimony at the time of trial.  Adam has wholly failed to present any reason to justify the extraordinary relief he seeks under CR 60.02.

29

A 241.

There is no per se rule requiring the exclusion of a statement of identification obtained through coercive police procedures.[14]  *See Manson*, 432 U.S. at 114.  A due process violation occurs only when the coercive, or otherwise suggestive, police procedure results in an unreliable identification.  It is the unreliability of the identification, not whatever pressure may have been brought to bear on the witness, that is the source of harm to a defendant.  *See, e.g.*, *U.S. v. Bouthot*, 878 F.2d 1506, 1515-16 (1st Cir. 1989) ("Whereas coerced confessions may violate an independent constitutionally protected interest, the suggestive identification of a suspect *per se* does not violate any constitutionally protected interest. . . . Whereas a coerced confession is suppressed primarily to deter future violations of the Constitution, overly suggestive identifications are suppressed primarily to avoid an unfair trial.  In the latter scenario, the Due Process Clause protects an evidentiary interest: reliability (internal citations omitted)).

A due process violation may also occur if a witness was "coerced into making *false* statements and those statements were admitted against the defendant[] at trial."  *Spearman v. Birkett*, No. 05-40006, 2006 WL 6032120, at

---

[14]Adams has not clearly presented to the court exactly how he believes the alleged coercion taints his conviction.  In his petition and objections, he says the coercion was used to get an identification so that the police could obtain a warrant for his arrest.  Whether or not there was sufficient reliable evidence to justify the issuance of the original arrest warrant is a tangential issue not raised in the petition. Nor has Adams argued, as discussed above, that Searight's identification was unreliable.  The state court treated the claim that Searight identified Adams under duress as an allegation calling into question the veracity of Searight's trial testimony, and this court will do the same.

*24 (E.D. Mich. March 31, 2006) (quoting *U.S. v. Gonzalez*, 164 F.3d 1285, 1289

(10th Cir. 1999)).  The inclusion of *false* and *involuntary* evidence at trial is key;

even if a witness were coerced into making a false statement (including one of

identification), a due process violation would occur only were he also coerced into

giving false testimony at trial.  *Id.* (discussing *Douglas v. Woodford*, 316 F.3d

1079, 1092 (9th Cir. 2003) and finding no due process violation where even

though witness testified her initial statement was coerced, coercion had led her to

tell the truth and her trial testimony was not involuntary)).

Although the state court cites no U.S. Supreme Court law, its conclusion is

in line with that court's precedent.  This court "must defer to the state courts'

findings with respect to primary or historical facts, which are rebuttable only by

clear and convincing evidence."  *Apanovitch v. Houk*, 466 F.3d 460, 473 (6th Cir.

2006) (citing *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)).

Here, the state court determined that it had no reason to doubt the veracity

of Searight's trial testimony.  The court noted that the evidence before it showed

that Searight was reluctant to be involved in the investigation and felt pressured to

tell police what he knew.  Adams has presented no "clear and convincing" evidence

to rebut these findings, and these factual findings support the legal conclusion that

Adams has suffered no violation of his constitutional right to due process.


D.      Double jeopardy

31

The petitioner next claims that he is entitled to federal habeas corpus relief due to a double-jeopardy violation.

On September 8, 1997, the petitioner was indicted on charges of first-degree rape, two counts of kidnapping, two counts of first-degree robbery, and being a persistent felony offender in the second degree. *See* A 482-83. On December 17, 1997, the indictment was dismissed and the petitioner was re-indicted on the same charges, with an additional charge of first-degree sodomy and with an added co-defendant, Dexter Middlebrooks. *Id.* The petitioner argues that the second indictment put him in double jeopardy because the first indictment was "good on its face" and had been dismissed. *See* R.25, p. 12.

The petitioner first raised this claim in his November 17, 2004, habeas corpus petition filed with the Lyon Circuit Court. *See* A 454. That court ruled on the merits of the claim, reasoning that "[i]t is black letter law that jeopardy does not attach until a jury has been sworn . . . or until the first witness is sworn. While an abuse of discretion or due process might be raised by a continual indictment and dismissal by the state, this does not raise a jeopardy question." A 454. The Kentucky Court of Appeals declined to make a ruling on the merits of the claim, instead affirming the circuit court's denial because the petitioner should have raised his double-jeopardy claim either on direct appeal or in his CR 60.02 motion for post-conviction relief. *See* A 483.

"Federal habeas review is precluded where a state court does not address a petitioner's federal claims because the petitioner has failed to meet a state

32

procedural requirement that is independent of the federal question and adequate to support the judgment." *Biros v. Bagley*, 422 F.3d 379 (6th Cir. 2005) (citing *Coleman v. Thompson*, 501 U.S. 722, 729-30).  Here, the Kentucky Court of Appeals clearly identified a state procedural rule as the reason for its denial of Mr. Adams's double-jeopardy claim, thus precluding federal review of the state decision on this claim.  A 482-83 (citing *Wingo v. Ringo*, 408 S.W. 2d 469 (Ky. 1966)).  The petitioner makes no argument that circumstances exist requiring the court to consider the merits despite the procedural default.  Nor could he do so successfully, as no cognizable double-jeopardy claim exists.[15]

E.     DNA analysis

Adams next claims that he is entitled to a writ of habeas corpus because he believes DNA analysis established his "actual innocence."  In order to prevail on a "free-standing" actual innocence claim, as opposed to a "gateway" claim used to overcome procedural default,[16] a petitioner must demonstrate that "no rational trier of fact could [find] proof of guilt beyond a reasonable doubt."  *Souter v. Jones*,

---

[15]Jeopardy attaches when the jury is empaneled and sworn or when the first witness in the trial testifies, whichever comes first.  *See, e.g.*, *Fulton v. Moore*, 520 F.3d 522 (6th Cir. 2008).  In the present case, the first indictment was dismissed months before February of 1998, when the jury was impaneled and the first witness testified at trial.  Thus, the petitioner's double-jeopardy claim is completely without merit.

[16]A "gateway" actual innocence claim is a petitioner's argument that because he is factually innocent, the court must consider the merits of those claims either procedurally defaulted or time-barred.  *See generally Herrera*, 506 U.S. at 426 (White, J. concurring).

395 F.3d 577, 596 n.11 (6th Cir. 2005) (quoting *Herrera*, 506 U.S. 390, 426 (1993) (White, J. concurring)); *see also Schlup v. Delo*, 513 U.S. 298, 330 (1995). A gateway actual innocence claim requires a lower burden of proof than a free-standing actual innocence claim. *See Schlup*, 513 U.S. at 330; *Stojetz v. Ishee*, No. 04-263, 2006 WL 328155, at *10 (S.D. Ohio Feb. 10, 2006) (noting that "free-standing claims of actual innocence involve a different, and surely more exacting, standard of proof than gateway claims of actual innocence").

Adams objects to the Magistrate Judge's finding that the petitioner procedurally defaulted this claim because he did not raise it in the state courts. Adams argues that he attempted to raise the claim in his direct appeal.  As proof he points the court to a letter to him from his appellate counsel and a supplemental reply brief which he filed *pro se* in the state courts.  A 313-14, A 590-97.  Neither of these documents contains any attempt to raise a claim specifically regarding the DNA evidence brought in the case.

Furthermore, even if he had raised the claim in his *pro se* filings in state court, that fact alone does not establish the good cause necessary to overcome the procedural default.  *See* discussion, *supra* III(B)(1)*.*  Therefore, Adams has not shown the good cause necessary to overcome a procedural default.  *See Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) ("When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from

34

reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review."(citations omitted)).  The court has reviewed the record and concurs with the Magistrate Judge that Adams is in procedural default as to this claim.

Adams argues that the court's failure to consider the merits of this claim is "a miscarriage of justice."[17]  Where the federal court's refusal to rule upon the merits of a claim will result in a "miscarriage of justice," a court may excuse a petitioner's failure to exhaust state-court remedies.  *See Seymour*, 224 F.3d at 550. As discussed above, a claim of "actual innocence," if established, can be a "gateway" for a court to consider the merits of a procedurally defaulted claim, and so considering the merits of the "actual innocence" claim itself is especially appropriate.  However, upon review of the record, the court concludes that Adams's claim of actual innocence is without merit.

"[A]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley v. U.S.*, 523 U.S. 614, 623 (1998).  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness

---

[17]As part of this argument, Adams points to what he sees as an inconsistency between the respondent's admission that the DNA evidence did not inculpate him and the Kentucky Court of Appeals's summary statement that "[p]hysical evidence recovered from the female victim linked Adams to the sexual assault and was not subject to suppression." *See* R. 25, pg. 13-14.  There is no inconsistency.  The term "physical evidence" includes far more than DNA evidence.

accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324.

Here, the DNA evidence at issue is neither new nor exculpatory.  It was introduced at trial and presented to the jury as inconclusive.  The testifying expert stated that there was insufficient DNA evidence collected from the victim and the crime scene to permit DNA typing.  *See* TAPE 2, 2/12/98; 9:43:00-9:48:00.  As explained by the expert in both her direct testimony and during cross-examination, the DNA evidence did not inculpate the petitioner *or anyone else*.[18]  *Id.* at 9:47:00-

---

[18]The Magistrate Judge provides this summary of the relevant trial proceedings:

> At trial, Kentucky State Police forensic serologist Linda Winkle testified that a minimum of 300-330 sperm cells are needed to do DNA typing (TAPE No. 2: 2/12/98; 9:43:00-9:45:00).  Winkle stated that she examined three vaginal swabs taken from the victim; one swab had no sperm heads on it; the other two swabs had two sperm heads each (*Id.*).  There was also a fourth vaginal swab submitted to her, but she did not test that swab because of the lab's policy not to consume all evidence in testing unless absolutely necessary, and because even if the fourth swab had ten times as many sperm cells as the other swabs she still would have had an insufficient number of cells for DNA testing (*Id.*).  Her conclusion that there were insufficient sperm cells for testing was further confirmed by a vaginal smear slide that was taken from the victim (*Id.*).  This smear slide contained no sperm cells (*Id.*).
>
> Thus, the evidence at trial showed that there was insufficient evidence of semen collected from the victim to permit DNA typing. [. . .] Winkle found no semen on any of [the victim's clothing or other items collected from the scene]. (TAPE No. 2: 2/12/98; 9:45:00-9:46:00).  In fact, on cross-examination, defense counsel elicited testimony from Linda Winkle to the effect that because there were insufficient sperm cells recovered from the evidence submitted to her she could not say that the semen found was petitioner's semen.  (*Id.* at 9:47:00-9:48:00).  She could not say whose semen was found on the exhibits she examined (*Id.*).

36

9:48:00.  Adams's claim that DNA evidence establishes his actual innocence is therefore without merit.[19]

## IV.   Certificate of Appealability

A Certificate of Appealability may be issued where "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Such a substantial showing is made when it is evident that "reasonable jurists could debate whether … the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (*quoting Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The court adopts the Magistrate Judge's recommendation that reasonable jurists would not find debatable or wrong the correctness of the assessments made in this case; therefore, the court declines to issue a certificate of appealability.

## V.   Conclusion

Accordingly,

**IT IS ORDERED** that the Magistrate Judge's Report and Recommendation (R. 19) is **ADOPTED** as this court's opinion with the addition of the analysis set forth

---

R. 19, p.19-20.

[19]Adams's contention that without DNA evidence, there can be no sexual assault, is simply erroneous.  Here, as stated above, there was *no* DNA evidence available.  Other evidence supported Adams's conviction.

above.

**IT IS FURTHER ORDERED** that the respondent's motion for summary judgment (R. 11) is **GRANTED.**

**IT IS FURTHER ORDERED** that the petitioner's application for a writ of habeas corpus (R. 1) is **DENIED AND DISMISSED with prejudice**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED,** as the petitioner has failed to make a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c)(1).

_____
        Signed on  March 31, 2009

_____

JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

_____